******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
BRUCE JOHN BEMER
(SC 20429)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Pursuant to statute ((Rev. to 2015) § 53a-83 (c) (2) (A)), patronizing a prostitute is a class C felony if the individual guilty of that offense "knew or reasonably should have known at the time of the offense that such other person . . . was the victim of conduct of another person that constitutes . . . trafficking in persons . . . ."

Pursuant further to statute ((Supp. 2016) § 53a-192a (a) (1)), "[a] person is guilty of trafficking in persons when such person . . . compels or induces another person to engage in conduct involving more than one occurrence of sexual conduct with one or more third persons" by means of fraud or coercion.

Convicted of multiple counts of the felony of patronizing a prostitute and of one count of trafficking in persons as an accessory, the defendant appealed, claiming that the state had presented insufficient evidence to convict him of those offenses. The defendant's conviction stemmed from his involvement with K, whom the defendant had known for more than twenty years and had employed to perform odd jobs for him. During that time, K arranged for the defendant to meet with men K had recruited. The defendant would then engage in sexual conduct with those men for a fee. The defendant did not communicate with the men directly to coordinate their meetings. Instead, K would phone or text the defendant, sometimes including photographs of the men, to gauge his interest and then arrange for them to meet. The defendant paid the men directly but knew that K would receive a portion of the fee. Altogether, the defendant had engaged in more than 100 sexual encounters with approximately eight to ten men, several of whom testified at the defendant's trial. On appeal from the judgment of conviction, *held*:

1. The evidence was insufficient to convict the defendant of the felony of patronizing a prostitute, as the state did not produce sufficient evidence to demonstrate that the defendant knew or reasonably should have known that the men with whom he engaged in sexual conduct for a fee were victims of K's trafficking: to prove that the defendant was guilty of patronizing a prostitute who was a victim of another person's conduct that constitutes trafficking, in violation of § 53a-83 (c), the state was required to show that the defendant knew or should have known that K compelled or induced the men to have sex with the defendant by means of fraud or coercion; in the present case, there was no direct evidence that the defendant knew that the men were trafficked in such a manner, and it was too speculative to infer that the defendant knew or reasonably should have known that K was coercing or defrauding the men into prostitution, notwithstanding the length of his relationship with K and the number of encounters that were arranged, as there was no evidence that the defendant ever witnessed or otherwise knew of K's recruitment tactics, or that he was told by any of the men that they felt forced, coerced or defrauded into engaging in sexual conduct; moreover, the state could not prevail on its claim that it could reasonably be inferred that the defendant knew or reasonably should have known that K was engaged in trafficking on the basis that the defendant employed and was wealthier than K, because, although K's trafficking venture may have depended in some part on the fees paid by the defendant, there was no evidence that the defendant knew anything about the expenses incurred by K in connection with that venture or that the defendant made any financial contributions thereto, aside from being one of K's frequent customers; furthermore, the fact that the men had mental health issues or were often under the influence of drugs during their encounters with the defendant was insufficient to support a finding that the defendant knew or had reason to know that K was engaged in trafficking, as there was no evidence that any of the men used drugs

in front of the defendant or that he was aware of their drug use, the defendant's interactions with the men were limited, and at least one of the men hid his drug use from the defendant because he knew that the defendant would disapprove.

2. The evidence was insufficient to prove that the defendant was guilty of trafficking in persons as an accessory, as the state did not demonstrate that the defendant had the specific intent necessary for accessorial liability with respect to that offense; in light of this court's conclusion that the evidence was insufficient to prove that the defendant knew or had reason to know that the men whom K arranged for the defendant to meet were the victims of K's trafficking, a jury reasonably could not have found that the defendant knowingly and wilfully assisted K in trafficking those individuals.

Argued October 14, 2020—officially released September 29, 2021*

*Procedural History*

Substitute information charging the defendant with four counts of the crime of patronizing a prostitute, and with one count of the crime of trafficking in persons as an accessory, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Pavia, J.*; verdict and judgment of guilty, from which the defendant appealed. *Reversed*; *judgment directed.*

*Brendon P. Levesque*, with whom were *Wesley W. Horton* and, on the brief, *Michael S. Taylor, Anthony Spinella* and *Ryan Barry*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Sharmese L. Hodge*, former assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Bruce John Bemer, appeals from his conviction of four counts of the crime of patronizing a prostitute in violation of General Statutes (Rev. to 2015) § 53a-83 (c),[1] and of one count of the crime of trafficking in persons as an accessory in violation of General Statutes (Supp. 2016) § 53a-192a[2] and General Statutes § 53a-8. On appeal, the defendant claims, inter alia, that the state presented insufficient evidence to convict him of any of the charged counts. We agree and reverse the judgment of the trial court.[3]

The jury reasonably could have found the following facts. The defendant owned and operated several businesses: a propane company in Glastonbury, a motorcycle shop in the Hartford area, and the Waterford Speedbowl racetrack. He became acquainted with Robert King, who worked at a car dealership near one of the defendant's businesses. King also performed odd jobs for the defendant's propane company. The defendant and King knew each other for approximately twenty to twenty-five years prior to 2016.

During that time, King would bring men to the defendant for the defendant to engage in sexual conduct with for a fee. The defendant and King would usually communicate and coordinate the visits by phone. King and the defendant would also communicate via text. Sometimes, after King recruited the men, he would send pictures of them to the defendant, and the defendant would comment and indicate whether he was interested in having King bring them to him. The defendant did not communicate with the men directly to arrange the meetings. Most of the visits took place at the defendant's office or at a hotel near Hartford-Brainard Airport. The defendant would engage in sexual conduct with the men and pay them directly, but he knew that King would receive a portion of the fee. Altogether, the defendant engaged in sexual conduct with approximately eight to ten men. Some of the men would come back repeatedly; others would not. The defendant did not know the names of most of the men.

In January, 2016, Daniel Trompetta, a detective in the Danbury Police Department, received information that a sex trafficking operation was being run out of Danbury by King and another individual, William Trefzger. As a result, Trompetta began surveillance of King's trailer. Eventually, the police executed a search warrant at King's trailer and interviewed King. This interview led them to the defendant. Thereafter, they interviewed the defendant and Trefzger. The police then issued arrest warrants for the defendant, King and Trefzger.

At trial, four of the men who had engaged in sexual conduct with the defendant in return for a fee testified. First was Brian I. Brian testified that King approached him while he was employed at a local garden center

and asked him to come to King's house to plant a tree. Once at King's house, and for days thereafter, King attempted to entice Brian into using drugs. Prior to that, Brian had been an addict but was sober for a couple of months. Brian eventually succumbed and began using drugs, and began living and sleeping in King's trailer. After a while, King informed Brian that he had incurred a debt with King for hundreds of dollars for the drugs King had supplied.

Thereafter, King made an arrangement with Brian that he could repay the debt by engaging in sexual conduct with the defendant for a fee. King instructed Brian that he was not to discuss the fee with the defendant and that the defendant would pay Brian different amounts, depending on his level of satisfaction. The defendant usually paid about $300. Brian then would give King $50. King did not allow Brian to contact the defendant directly. Brian engaged in sexual conduct with the defendant approximately fifty times and was usually under the influence of drugs when he did so. If Brian ever refused to engage in sexual conduct with the defendant, King would threaten to contact Brian's mother.

Brian also engaged in sexual conduct for a fee with at least one other individual. He also engaged in sexual conduct with King.

Next was Michael F. Michael met King in 2006 at a drug treatment center. King befriended Michael and offered to be Michael's recovery sponsor. After Michael left the drug treatment center, he continued to socialize with King and King's friends and began using drugs with King's friends.

Michael then began living in King's trailer, where King provided him with food, shelter and drugs. At first, King indicated that he was helping Michael as a friend. After a period of time, King informed Michael that he had to pay King back for the food, shelter and drugs.

Like he did with Brian, King proposed that Michael could repay the debt by engaging in sexual conduct with the defendant in exchange for money. Michael agreed. The defendant usually paid about $150. Michael then would give King $50. King did not permit Michael to contact the defendant directly. Michael engaged in sexual conduct with the defendant approximately twenty times. Unbeknownst to the defendant, Michael typically would use drugs immediately after engaging in sexual conduct with the defendant.

Michael was in prison from 2009 to 2011 and remained sober during that time. Upon his release from prison, King convinced him to return to the same arrangement for drugs and engaging in sexual conduct with the defendant for a fee.

Michael also engaged in sexual conduct for a fee with at least one other individual.

Third to testify was William W. At the time that William met King, he was homeless and living in Middletown. Prior to their meeting, King had seen William interviewed on television by a local news station about staying warm during the winter. After seeing the broadcast, King contacted William via Facebook and offered to help him with his financial and living situation. William agreed, and they planned to meet.

King picked up William in Middletown, bought him heroin and then brought him back to King's trailer in Danbury. William lived there for the next few days, eating and getting high. After a while, King informed William that William owed him money. Like he did with Brian and Michael, King proposed that William could repay the debt by engaging in sexual conduct with the defendant for a fee. William agreed.

The defendant usually paid about $300. William then would give King $100. King did not allow William to contact the defendant directly. William engaged in sexual conduct with the defendant approximately seven to ten times and would typically use drugs prior to seeing the defendant.

At one point in time, William stopped living in King's trailer and stopped engaging in sexual conduct with the defendant. Subsequently, however, William contacted King and then engaged in sexual conduct with the defendant for a fee one more time.

William also engaged in sexual conduct for a fee with at least one other individual. King also coordinated that transaction.

Finally, Daniel T. testified. Daniel met King while he was looking for cans at a gas station. He was twenty-one years old and living in a halfway house at the time. King told Daniel that he had cans back at his trailer and drove Daniel there. Once back at the trailer, Daniel remained with King and others that day. King then asked Daniel if he wanted to make money. Daniel said he did. King then arranged for Daniel to see the defendant to engage in sexual conduct for a fee.

Daniel engaged in sexual conduct with the defendant approximately forty to fifty times and would typically use drugs after leaving the defendant's presence. The defendant usually paid about $300. Daniel then would give King $50. Each visit to see the defendant was arranged by King.

Daniel also engaged in sexual conduct for a fee with at least one other individual whom he met through King. Daniel would sometimes spend the night with this other individual. He never slept over at the defendant's house. Daniel testified that, instead, he usually only had a brief interaction with the defendant.

The jury found the defendant guilty of four counts of patronizing a prostitute and one count of trafficking

in persons as an accessory.[4] This appeal followed.[5]

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Covington*, 335 Conn. 212, 219, 229 A.3d 1036 (2020).

Although "[t]here is no distinction between direct and circumstantial evidence as far as probative force is concerned"; *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981); "[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 768–69, 36 A.3d 670 (2012).

I

On appeal, the defendant claims, inter alia,[6] that the state presented insufficient evidence for a reasonable jury to have concluded that, at the time of the alleged offenses, he knew or reasonably should have known that the men with whom he engaged in sexual conduct for a fee were trafficked. In other words, the defendant asserts that the state did not produce sufficient evidence to demonstrate that he knew or reasonably should have known that the men were engaged in prostitution because they had been compelled or induced to do so by means of fraud or coercion. We agree.

The defendant was charged with four counts of the crime of patronizing a prostitute in violation of § 53a-83 (c). General Statutes (Rev. to 2015) § 53a-83 provides in relevant part: "(a) A person is guilty of patronizing

a prostitute when: (1) Pursuant to a prior understanding, he pays a fee to another person as compensation for such person or a third person having engaged in sexual conduct with him; or (2) he pays or agrees to pay a fee to another person pursuant to an understanding that in return therefor such person or a third person will engage in sexual conduct with him; or (3) he solicits or requests another person to engage in sexual conduct with him in return for a fee.

"(b) Except as provided in subsection (c) of this section, patronizing a prostitute is a class A misdemeanor.

"(c) Patronizing a prostitute is a class C felony if such person knew or reasonably should have known at the time of the offense that such other person (1) had not attained eighteen years of age, or (2) was the victim of conduct of another person that constitutes (A) trafficking in persons in violation of section 53a-192a . . . ."

Accordingly, in order to prove that the defendant was guilty of patronizing a prostitute in violation of § 53a-83 (c), the state had to prove that he (1) solicited or requested another person to engage in sexual conduct with him in return for a fee, and (2) knew or reasonably should have known at the time of the offense that such other person was the victim of conduct of another person that constitutes trafficking in persons in violation of § 53a-192a. The defendant does not challenge that the first element was established beyond a reasonable doubt.

At all times relevant to the present case, the legislature had differentiated, through the use of an enhanced penalty, between the misdemeanor of patronizing a prostitute and the felony of patronizing a prostitute that the defendant knew or should have known was a victim of trafficking. That distinction lies at the heart of this case. Something more than knowing the pimp for a number of years or even patronizing the same men repeatedly was required to show that the defendant knew or should have known that the men were not only prostitutes, but also that they were victims of trafficking.

Here, the defendant's claim focuses on the required element of knowledge. Therefore, we turn to the question of whether the evidence supports the conclusion that, at the time of the offense, the defendant knew or reasonably should have known that the men were the victims of conduct of another person that constitutes trafficking in persons in violation of § 53a-192a.[7]

General Statutes (Supp. 2016) § 53a-192a provides in relevant part: "(a) A person is guilty of trafficking in persons when such person (1) compels or induces another person to engage in conduct involving more than one occurrence of sexual contact with one or more

third persons . . . by means of . . . (B) fraud, or (C) coercion, as provided in section 53a-192 . . . .''

In order for the state to prove that the defendant patronized a trafficked individual, it was necessary for the state to show that the defendant knew or should have known that King compelled or induced the men to have sex with the defendant by means of fraud or coercion. The state does not point to and we cannot find any direct evidence that the defendant knew that the men were trafficked within the meaning of the statute. The state argues on appeal, as it did in its closing argument at trial, that the jury could have inferred that the defendant knew or reasonably should have known that the victims were trafficked and of the recruitment tactics used by King on the basis of circumstantial evidence. In support of its claim, the state relies on the length of the relationship between King and the defendant, the nature of that relationship, and the compromised mental states of the men. We will address each of these in turn.

First, the state asserts that the length of the relationship between King and the defendant was sufficient for the jury to infer that the defendant knew or had reason to know that King was trafficking the men. King and the defendant knew each other for approximately twenty to twenty-five years and had an illicit relationship in which King would arrange for men to have sexual conduct with the defendant, which resulted in more than 100 encounters between the defendant and various men.

We agree that the fact that the defendant knew King for twenty to twenty-five years and frequently had him arrange for men to engage in sexual conduct raises the suspicion that the defendant may have known about King's recruitment tactics. But the correlation between the length of time that the defendant paid for these men and any knowledge on the defendant's part of King's method for inducing the men to engage in prostitution is weak. Being a longtime patron of prostitutes provided by a pimp does not impute knowledge of the pimp's recruitment or retention methods. Thus, because the connection is slight, the inference that the defendant knew or should have known that these individuals were trafficked is not a reasonable one. "When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight . . . the inference is less reasonable.'' (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 238, 249 A.3d 683 (2020).

Indeed, there was no evidence that, during the years that King arranged men for the defendant, the defendant

ever witnessed any of King's recruitment tactics or was told by any of the individuals that they felt forced, coerced or defrauded into engaging in sexual conduct. To the contrary, the evidence demonstrated that the defendant had little to no dialogue with the men and that the liaisons were short and did not include socializing, only allowing time for the sexual conduct. Furthermore, all of the evidence showed that the defendant did not have direct communication with the men to arrange visits or to discuss financial arrangements, but only communicated directly with King on those topics. There also was no evidence that King ever revealed his recruitment tactics to the defendant. King did not testify at the trial in this matter.

"It is a fundamental precept that mere friendship or association with a known criminal does not establish a logical connection with the [criminal's] crime." (Internal quotation marks omitted.) Id., 288–89 (*Ecker, J.*, concurring in part and dissenting in part); see, e.g., *United States* v. *Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989) ("mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement"). Accordingly, we conclude that, without more, inferring that the defendant knew or reasonably should have known that King was coercing and/or defrauding these men into prostitution simply from the length of time the defendant knew him is too speculative. See, e.g., *State* v. *Lewis*, supra, 303 Conn. 768–69 ("[a]t some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation" (internal quotation marks omitted)).

Second, the state asserts that the jury could infer from the nature of the relationship between the defendant and King that the defendant knew or reasonably should have known that King was engaged in trafficking these men. Specifically, the state asserts that the jury could have inferred that, because the defendant employed King and was wealthier than him, the defendant knew or reasonably should have known that King was trafficking these individuals. We disagree.

The state introduced evidence that King was employed by the defendant's business to perform odd jobs at the business, such as checking customer's propane meters. The state further showed that, in 2016, it appeared that King did not have any employment other than performing odd jobs for the defendant and his propane business. Although this evidence further demonstrates that King and the defendant had an ongoing relationship during this time period, it does not demonstrate any fact from which knowledge of trafficking could be inferred.

The state suggests that the defendant "was not only King's boss at the defendant's propane company but, more importantly, was by far the wealthier party, whose financial contributions were essential to the sustainability of this type of trafficking venture for such a long

period of time." There was no evidence presented demonstrating that the defendant knew anything about the expenses incurred by King in connection with his trafficking venture or made any financial contributions to that venture, aside from paying for the men. Although it is possible that King's trafficking venture may have depended, at least in part, on the fees paid by the defendant, one cannot infer from his payment of fees, as a customer, that he knew or had reason to know that King was engaged in trafficking.

Furthermore, there was evidence in the present case that the men also engaged in sexual conduct for a fee with at least one other individual. Indeed, one of the men testified that he would sometimes spend the night with another individual whom he met through King and would engage in sexual conduct with him for a fee during that time. Therefore, contrary to the state's assertion, there was evidence to demonstrate that King's business was not wholly dependent on the defendant's financial contributions. There was no evidence from which a jury could infer that the defendant supported King's trafficking venture beyond being one of King's frequent customers.

Third, the state asserts that the jury reasonably could have inferred that the defendant knew or had reason to know that King was engaged in trafficking because of the compromised mental states of the men. Specifically, the state asserts that, because each of the men either had substance abuse problems or mental health issues, the defendant knew or reasonably should have known that they were not willingly participating in the sexual conduct.

Although the evidence demonstrated that the men were often on drugs when they saw the defendant or had mental health issues, the evidence also demonstrated that the defendant had limited conversations and interactions with them, giving him little opportunity to notice such issues. Indeed, there was no evidence presented at trial that any of the men used drugs in front of the defendant or that he was aware of their drug use. Instead, the testimony indicated that at least one of the men hid his drug use from the defendant because he knew that the defendant did not want anything to do with drugs.

The evidence showed that the interactions between the defendant and the men were short and that there was very little dialogue between them. The evidence demonstrated that the interactions were only long enough to engage in sexual conduct. There was no evidence to show that the men exhibited outward signs of substance abuse or mental health issues from which the jury could have inferred that the defendant was aware of their drug use or mental health issues.[8] Without more, the jury would have to resort to impermissible speculation to infer that the defendant should have both

known that the men were using drugs or had mental health issues and also understood that their drug use or mental health issues meant that they were victims of trafficking.

The state's theory not only requires impermissible speculation, but is undercut by the evidence presented. The evidence demonstrated that, when the defendant did notice a mental health issue with one of the men provided by King, he asked to no longer see that individual. In addition, Brian testified that he had to hide any drugs in his possession when he went to see the defendant because the defendant did not want anything to do with drugs. That evidence makes reasonable the inference that the defendant continued to see only those men who did not exhibit noticeable signs of substance abuse or mental health problems.

Furthermore, the state asserts that "it was clear that the defendant not only was actively involved in the recruiting process (as evidenced by both testimony and the phone texts) but was, in fact, calling the shots." There is no evidence in the record to support any of these conclusions. As we previously discussed, the defendant and King would communicate about which men King should bring to the defendant, and, sometimes, King would send the defendant photographs of various men to allow the defendant to choose whom he wanted to see. These text messages and communications did not, however, include any information about the recruitment process used by King or any other information from which the defendant would know that the prostitutes were trafficked.

For instance, William testified that King texted his picture to the defendant so that the defendant could decide if he was interested. The evidence does not reflect that the defendant was involved in selecting William or any of the men for recruitment or otherwise involved in or told about the recruitment process. The evidence showed that the defendant was involved in selecting which men he would see from among those that King had already recruited. Therefore, contrary to the state's contention, the evidence showed that the defendant was a customer of King but was not actively involved in the recruitment process or "calling the shots."

Although we must not substitute our judgment for that of the jury, a reviewing court must determine whether the jury reasonably could have concluded as it did. In the present case, the jury had to speculate to conclude that the defendant knew or reasonably should have known that the men were the victims of trafficking. Accordingly, we conclude that the cumulative force of the state's evidence, even when the evidence is viewed in the light most favorable to sustaining the verdict, was insufficient to convict the defendant of four counts of the crime of patronizing a prostitute in violation of

§ 53a-83 (c). Because the prohibition against double jeopardy bars retrial of those offenses, we remand the case with direction to render judgment of not guilty as to those charges.

## II

The defendant also asserts that the evidence was insufficient to prove that he was guilty of one count of the crime of trafficking in persons as an accessory in violation of §§ 53a-192a and 53a-8. Specifically, the defendant asserts that the state did not prove that he had the specific intent necessary for accessorial liability for the crime of trafficking in persons. We agree.

In count five of the substitute long form information, the state charged the defendant "with the crime of criminal liability for trafficking in persons and charge[d] that during 2012 [through] August, 2016, in and around the state of Connecticut, [the defendant] intentionally aided . . . King to engage in conduct which constituted trafficking in persons by compelling and inducing another person to engage in conduct involving sexual contact with one or more third persons by means of fraud and coercion in violation of [§§ 53a-192a and 53a-8]."

"[T]o be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . . Thus, [u]nlike coconspirator liability under *Pinkerton* [v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)] . . . accessorial liability pursuant to § 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime. . . . [A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. . . . Each such element must be proved beyond a reasonable doubt." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 765, 59 A.3d 221 (2013).

Because we concluded in part I of this opinion that the evidence was insufficient to prove that the defendant knew or had reason to know that the men were the victims of King's trafficking, we cannot conclude that the jury reasonably could have found that the defendant knowingly and wilfully assisted King in trafficking those individuals. Accordingly, we conclude that the evidence was insufficient to prove that the defendant was guilty of the crime of trafficking in persons as an accessory. Because the prohibition against double jeopardy bars retrial of that offense, we remand the

case with direction to render judgment of not guilty as to that charge.

The judgment is reversed and the case is remanded with direction to render judgment of not guilty.

In this opinion the other justices concurred.

* September 29, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] These charges were based on conduct that allegedly had occurred between October, 2013, and August, 2016. Section 53a-83 was not the subject of any amendments during that time period. In the interest of simplicity, all references to § 53a-83 in this opinion are to the 2015 revision of the statute.

[2] This charge was based on conduct that allegedly had occurred between 2012 and August, 2016. Because the parties indicated that it is "undisputed" that the version of § 53a-192a in the 2016 supplement to the General Statutes is "the relevant substantive [statute] in this case," all references to § 53a-192a in this opinion are to the version of the statute in the 2016 supplement.

[3] The defendant also raises two instructional error claims that he argues entitle him to a reversal of his conviction and a new trial. Those claims are that the trial court incorrectly charged the jury on General Statutes § 53a-192 (a) (3) because it (1) failed to include a threat to "expose any secret" as an essential element of the crime, and (2) included debt bondage under "impair any person's credit . . . ." Because we agree with the defendant's claim that there was insufficient evidence to support an essential element of the crimes of which he was convicted, we need not reach his instructional error claims.

[4] The state had previously charged the defendant with seven counts of patronizing a prostitute in violation of § 53a-83 (c) but withdrew three of the counts at the close of the state's evidence.

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[6] See footnote 3 of this opinion.

[7] Because the defendant's sufficiency claim centers on whether the defendant knew or reasonably should have known that the individuals with whom he engaged in sexual conduct were the victims of King's conduct that constitutes trafficking, for the purposes of analyzing this claim, we assume that the state proved beyond a reasonable doubt that King engaged in trafficking.

[8] One individual testified that, on a few occasions, he was unable to perform sexually while with the defendant as a result of the drugs. There was no evidence that the individual told the defendant why he was unable to perform. Thus, because this only happened occasionally and could have been attributed to many other factors, one cannot infer that the defendant should have known that the individual was using drugs and that drug use was an indication that he was a victim of trafficking.