******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* FRANK GONSALVES (AC 47606)

Alvord, Suarez and Palmer, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of, inter alia, assault in the first degree as an accessory, conspiracy to commit assault in the first degree and conspiracy to commit robbery in the first degree, the defendant appealed. The charges stemmed from an incident in which, after four individuals entered a house to commit a robbery, one of the perpetrators shot and seriously injured an occupant of the house, C. The defendant claimed, inter alia, that the evidence was insufficient to support his convictions of all three offenses. *Held*:

This court reversed the defendant's conviction with respect to the charge of assault in the first degree as an accessory, as there was no evidence from which the jury could have inferred, beyond a reasonable doubt, that the defendant intended to cause serious physical injury to C, or that he intentionally aided the perpetrator who did shoot C, which were required elements of the charge.

This court reversed the defendant's conviction with respect to the charge of conspiracy to commit assault in the first degree, as there was no evidence to establish that the defendant had the intent to cause C serious physical injury or that he intended that a deadly weapon would be used to injure C, thus, the state necessarily failed to prove that the defendant planned or conspired to cause C serious physical injury with a deadly weapon.

This court reversed the defendant's conviction with respect to the charge of conspiracy to commit robbery in the first degree, as there was no evidence that the defendant ever formed the specific intent that C would suffer a serious physical injury during the commission of the robbery and, consequently, there was also no evidence that the defendant agreed with any other perpetrator of the robbery to cause serious physical injury to any nonparticipant in the robbery, including C.

Argued May 20, 2025—officially released April 14, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree, conspiracy to commit assault in the first degree, robbery in the first degree and conspiracy to commit robbery in the first degree, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Pavia, J.*; verdict and judgment of guilty, from which the

defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Deren Manasevit*, assigned counsel, for the appellant (defendant).

*Lena A. Arnold*, special deputy state's attorney, with whom, on the brief, was *Joseph T. Corradino*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Frank Gonsalves, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-59 (a) (1), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134.[1] On appeal, the defendant claims that the evidence was insufficient to support his convictions of all three offenses. We agree with the defendant and, accordingly, we reverse the judgment of conviction with respect to each of those charges.[2]

The jury reasonably could have found the following facts. A few nights prior to January 14, 2014, Leah McNellis visited a house located at 585 Pond Street in Bridgeport (Pond Street house). McNellis had been at

---

[1] The defendant also was convicted of robbery in the first degree in violation of § 53a-134 (a) (1). See footnote 18 of this opinion. He has not appealed from his conviction of that offense, however, and it therefore is not the subject of this appeal.

[2] The defendant also claims that (1) the trial court committed plain error in its jury instructions on conspiracy to commit assault in the first degree and conspiracy to commit robbery in the first degree and (2) his convictions of both conspiracy to commit assault in the first degree and conspiracy to commit robbery in the first degree violate his constitutional protection against double jeopardy. Because we agree with the defendant that the evidence was insufficient to support his convictions of conspiracy to commit assault in the first degree and conspiracy to commit robbery in the first degree, we need not address these additional claims.

the Pond Street house on several prior occasions where she engaged in "partying, drinking, doing drugs" and, on occasion, provided sexual favors for residents of the house. McNellis knew the victim, Geraldo Costa, who lived in the house, and she also was acquainted with the other residents, Marcos Lima, Jose Silverio Ferreira and Gilvan Gonsalves. Upon McNellis leaving the house that night to walk back to her apartment, the defendant, who was driving a Mercury sport utility vehicle, and his brother, Maurice Orr, stopped to give her a ride.[3] On the ride home, McNellis told the defendant and Orr that the residents at the Pond Street house kept a considerable amount of money there and that Costa, in particular, kept money in his bedroom closet.

On the night of January 14, 2014, the defendant and Orr returned, unannounced, to McNellis' residence and waited in the defendant's vehicle until she walked outside. When she did, the defendant and Orr asked her to take them to the Pond Street house because they wanted to break into the house and steal the money that the residents kept there. Although McNellis preferred not to do so, she agreed because she "kind of wanted money, too." McNellis was uneasy about riding with the defendant and Orr, however, and she asked them to take her to her boyfriend's home so that she could pick up his car and drive to the Pond Street house herself. The defendant and Orr agreed and, after McNellis picked up her boyfriend's car, they followed her to the Pond Street house.

When they arrived, McNellis parked directly in front of the Pond Street house and the defendant and Orr parked across the street, facing in the opposite direction. The defendant and Orr asked McNellis about the layout of the house and the location of the money, and she provided the information as requested. According to McNellis, she observed that Orr was armed with a black handgun at this time. The defendant, Orr and two other perpetrators McNellis did not recognize sent her to gain entry into

[3] At the time, McNellis only knew the defendant by his nickname, Nitty, and Orr by his nickname, MoMo.

the house, and McNellis knocked on the door and called out to be let in. Receiving no response, McNellis climbed in through a window and opened the back door for the perpetrators. McNellis then walked back to her car and, shortly before midnight, she observed the defendant, Orr, and two unknown perpetrators enter the house through the back door. The defendant had left his vehicle running with the wheels turned out, pointed toward the road. According to McNellis, she did not drive away when the four men entered the house but, rather, remained in her car at the scene because she was concerned "[f]or not only the people in the house but people that went in."

Once inside, one of the intruders broke into the locked bedroom where Ferriera was sleeping and, brandishing a knife, demanded money from Ferreira. Ferreira gave the individual approximately $70 or $80 in cash and a check for $1000. Damage to Costa's bedroom door indicated that force also had been used to enter that bedroom. One or more of the intruders engaged in an altercation with Costa in the common hallway that resulted in Costa sustaining a gunshot wound to his head. The intruders then fled from the house, taking with them a flat screen television that was hanging on the wall in the kitchen.

While this was taking place inside the house, Officers David Uliano and Peter Billings of the Bridgeport Police Department each responded to a call that there were several masked men surrounding the Pond Street house. Upon arrival, Uliano noticed McNellis sitting in the car parked in front of the house. Before Uliano got out of his patrol car, he heard gunshots and radioed Billings. Uliano then approached McNellis and spoke to her briefly, at which point two men came running out of the house and down the driveway, in opposite directions. Uliano and Billings each chased one of the men, but they were unable to apprehend them. While Uliano and Billings were pursuing those two perpetrators, the two other men who had entered the house exited down the driveway, and they, too, evaded capture. McNellis,

after observing the four men running from the Pond Street house, drove away.

Shortly thereafter, paramedics responded to the scene, and Costa was transported to Saint Vincent's Hospital, where a CT scan revealed a skull fracture and bleeding in the brain. Costa underwent cranial surgery to remove a portion of his skull. The injuries that Costa suffered are serious and interrupt his major life functions.

The police towed the abandoned Mercury sport utility vehicle to the identification unit of the Bridgeport Police Department for processing, and the defendant was determined to be the registered owner of the vehicle. The identification unit obtained a search warrant for the vehicle and seized several items from inside the vehicle, including an LG cell phone, an iPhone, a photograph of an individual later identified as Juwan Gonsalves, a utility bill, a bottle of Remy Martin and a cork, a baseball hat and a black knit hat. On the basis of extracted data from the cell phones, the police concluded that the LG cell phone belonged to the defendant and the iPhone belonged to Orr. In addition, the defendant was included as a contributor to DNA found around the rim of the Remy Martin bottle, and Orr was included as a contributor to the baseball cap found in the vehicle.

The defendant was arrested and charged with assault in the first degree in violation of § 53a-59 (a) (1), conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1), robbery in the first degree in violation of § 53a-134 (a) (1) and conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134.[4] Following trial,[5] the jury found the defendant

---

[4] Orr also was arrested and charged with these crimes, and the court granted the state's motion for joinder of the two cases. After jury selection, however, Orr entered into a plea agreement with the state and, consequently, the defendant was tried alone.

[5] The witnesses at trial included McNellis, Lima, Ferreira, Gilvan Gonsalves and Officers Uliano and Billings. Costa had no recollection about the night in question and was unable to testify. None of the residents of the Pond Street house who did testify was able to identify any of the perpetrators.

guilty of each count. The court thereafter sentenced the defendant to a total effective sentence of eighteen years of imprisonment, followed by eleven years of special parole.[6] This appeal, challenging his convictions of assault in the first degree, conspiracy to commit assault in the first degree, and conspiracy to commit robbery in the first degree, followed.[7]

Before addressing the merits of the defendant's claims, we first set forth the principles applicable to the defendant's contention that the evidence was insufficient to support his convictions of all three of those offenses. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved

---

[6] More specifically, the court sentenced the defendant to concurrent terms of nine years of incarceration and eleven years of special parole with respect to the charges of assault in the first degree and conspiracy to commit assault in the first degree, and to concurrent sentences of nine years of incarceration and eleven years of special parole with respect to the charges of robbery in the first degree and conspiracy to commit robbery in the first degree, with the sentences on the defendant's convictions of assault in the first degree and conspiracy to commit assault in the first degree to run consecutively to the sentences on the convictions of robbery in the first degree and conspiracy to commit robbery in the first degree, for a total effective sentence of eighteen years of imprisonment, followed by eleven years of special parole.

[7] Due to an oversight, the defendant's application for waiver of fees and costs and the appointment of counsel was not granted by the court until April 10, 2024. On June 5, 2024, this court granted the defendant's motion for permission to file a late appeal, which had been filed on April 30, 2024.

beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *White*, 215 Conn. App. 273, 279–80, 283 A.3d 542 (2022), cert. denied, 346 Conn. 918, 291 A.3d 108 (2023). With these principles in mind, we turn to the defendant's claims of evidentiary insufficiency.

## I

The defendant first contends that the evidence was insufficient to support his conviction of assault in the first degree as an accessory under §§ 53a-8 and 53a-59 (a) (1) in connection with the shooting of Costa during the commission of the robbery at the Pond Street house.[8]

---

[8] We note that the defendant did not raise his claims of evidentiary insufficiency at trial and, on appeal, he seeks review of his unpreserved claims pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Our Supreme Court has "previously recognized that any defendant found guilty on the basis of insufficient evidence has been

In support of his claim, the defendant argues that there was no evidence from which the jury reasonably could infer, beyond a reasonable doubt, that he intended to cause serious physical injury to Costa, that he shot Costa himself, or that he intentionally aided the perpetrator who did shoot Costa. We agree with the defendant.

We commence our discussion of the defendant's claim with a review of the governing statutes and legal principles. Section 53a-59 provides in relevant part that "(a) [a] person is guilty of assault in the first degree when (1) [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." Thus, "[t]o warrant a conviction for assault in the first degree in violation of § 53a-59 (a) (1), the state bore the burden of proving the following elements beyond a reasonable doubt: (1) the defendant possessed the intent to cause serious physical injury to another person; (2) the defendant caused serious physical injury to such person . . . and (3) the defendant caused such injury by means of a deadly weapon or a dangerous instrument." (Internal quotation marks omitted.) *State* v. *Artis*, 136 Conn. App. 568, 580, 47 A.3d 419 (2012), rev'd, 314 Conn. 131, 101 A.3d 915 (2014).

Because it was unknown which of the four individuals who entered the house assaulted Costa, the state opted to proceed on a theory of accessorial liability under § 53a-8,[9] and the court instructed the jury on principal

deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. . . . Because there is no independent significance of a *Golding* analysis in this context, we review an unpreserved sufficiency of the evidence claim as though it had been preserved." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Hughes*, 341 Conn. 387, 395, 267 A.3d 81 (2021).

[9] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

liability, as well.[10]  "[F]or the purposes of determining criminal liability, it is of no consequence whether one is labeled an accessory or a principal." (Internal quotation marks omitted.) *State* v. *White*, supra, 215 Conn. App. 280. "[A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . ." (Internal quotation marks omitted.) *State* v. *Hinton*, 352 Conn. 183, 190–91, 336 A.3d 62 (2025).

"[A] conviction under § 53a-8 requires [the state to prove the defendant's] dual intent . . . [first] that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged. . . .  Additionally, one must knowingly and wilfully assist the perpetrator in the acts [that] prepare for, facilitate or consummate it." (Internal quotation marks omitted.)  *State* v. *White*, supra, 215 Conn. App. 280–81.  In other words, "[t]o be guilty as an accessory [under § 53a-8] one must *share* the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . .  [Section] 53a-8 requires the defendant have the specific mental state required for the commission of the substantive crime. . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense." (Emphasis in original; internal quotation marks omitted.)  *State* v. *Hinton*, supra, 352 Conn. 190–91.  Moreover, each of the elements must be proved beyond a reasonable doubt.

---

[10]We note that the operative substitute information did not charge the defendant as an accessory under § 53a-8.  At the charging conference, however, the prosecutor sought an instruction on accessorial and accomplice liability, and the court granted the state's request.  The defendant does not challenge the propriety of the court's decision to instruct the jury as the state requested.

See *State* v. *Gonzalez*, 311 Conn. 408, 424, 87 A.3d 1101 (2014).

Furthermore, "Connecticut case law remains consistent . . . in permitting the imposition of accessorial liability pursuant to § 53a-8, without requiring that the defendant intend to satisfy the criminal statute's aggravating circumstances in cases wherein that aggravating circumstance does not have a specific mental state and requires only that the principal act with the general intent to perform the prescribed act." *State* v. *Gonzalez*, 300 Conn. 490, 506, 15 A.3d 1049 (2011). In the present case, therefore, "the state was not required to prove that the defendant intended to cause serious physical injury *by means of a dangerous instrument*, or to prove that the defendant was even aware that another participant had a dangerous instrument . . . . The use of a dangerous instrument simply represents the means by which the defendant is alleged to have participated in causing the serious physical injury, but to be culpable, the defendant only needs to have the intent to cause serious physical injury to another person, not the intent to do so with a dangerous instrument." (Citation omitted; emphasis in original.) *State* v. *Artis*, supra, 136 Conn. App. 584–85.

Thus, "[a] person is an accessory to assault in the first degree by means of [a deadly weapon or] a dangerous instrument when he has the specific intent to cause serious physical injury to an individual and solicits, requests, commands, importunes or intentionally aids another person, who, using [a deadly weapon or] a dangerous instrument, causes serious injury to that individual while also possessing the specific intent to do so." *State* v. *Artis*, 314 Conn. 131, 159, 101 A.3d 915 (2014). "To act intentionally, the defendant must have had the conscious objective [to inflict serious physical injury on the victim]. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . [T]he defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. . . . Such conduct

yields facts and inferences that demonstrate a pattern of behavior toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *White*, supra, 215 Conn. App. 281.

As noted previously, the defendant has not appealed from his conviction of robbery in the first degree in violation of § 53a-134 (a) (1) for his participation in the robbery at the Pond Street house, and he does not challenge the sufficiency of the evidence with respect to that robbery. He also does not dispute either that Costa suffered a serious physical injury during the commission of the robbery or that the injury was caused by a deadly weapon. The defendant, however, does contest the sufficiency of the state's proof with respect to the two other elements of the assault, namely, that, like the principal, he had the specific intent to cause serious physical injury to Costa, and that he intentionally aided and assisted the principal in causing that injury. More specifically, the defendant maintains, first, that the evidence did not establish that he formed the intent to cause serious physical injury to Costa or anyone else either before or after he entered the Pond Street house. Second, the defendant argues that there was insufficient evidence to establish that the shooting was intentional and not accidental but that, even if the perpetrator who shot Costa had the specific intent to cause Costa serious physical injury, there is no proof that the defendant himself had that intent.

As the state concedes, the evidence was insufficient to prove that the defendant acted as a principal in Costa's shooting because the state's proof did not establish which of the four perpetrators of the robbery shot and seriously wounded Costa. We conclude, as well, that there was insufficient evidence to support the jury's guilty verdict with respect to the offense of assault in the first degree under an accessory theory of liability in accordance with § 53a-8. Although we must consider the evidence in the manner most favorable to upholding the verdict, the

defendant's conviction of assault in the first degree as an accessory cannot stand even under the most generous view of that evidence and the inferences that reasonably may be drawn therefrom.

As we have discussed, from this evidence, the jury reasonably found that the defendant and the other perpetrators planned to use force or the threat of force to accomplish the robbery, and they did so. The evidence that supports that finding, however, does not also support the conclusion that, at some unknown time prior to the shooting, the defendant and one or more of the other perpetrators planned to cause Costa serious physical injury and that the defendant aided and assisted the perpetrator in causing that injury. Rather, the evidence adduced at trial establishes only that, on the night of January 14, 2014, the defendant, along with Orr, who was armed, and two other masked men, entered the Pond Street house and, using force and threats to intimidate and overcome resistance by the residents, stole money and a television set and fled. This evidence, though sufficient proof of robbery, which is defined as the use or threatened use of force or compulsion to prevent or overcome resistance to, or otherwise facilitate, the taking of property from another person; see General Statutes § 53a-133;[11] is not sufficient to establish that the defendant aided and abetted Costa's shooting in accordance with the requirements of § 53a-8.

In support of its contrary claim, the state asserts that the defendant and the other perpetrators knew that the Pond Street house was occupied when they entered it late at night, and the perpetrators' entry into residents' bedrooms by breaking down locked doors indicated "that

---

[11] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) [p]reventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

the defendant and the other perpetrators . . . intended to overcome any resistance from the occupants of the house by using force." In further support of its claim, the state points to evidence demonstrating that the perpetrators' activities inside the house took place in a relatively small area in or near the common hallway where Costa was shot, thereby permitting the inference that "each perpetrator was aware of the events happening in [that] central hallway, namely, Costa being confronted by an armed coventurer and being shot in the head at close range when he attempted to thwart the robbery." In addition, the state relies on the fact that Orr possessed a handgun during the commission of the robbery and the defendant's purported knowledge of that fact; that the defendant fled the scene immediately after the shooting without summoning medical assistance for Costa or otherwise providing aid to him; and that the defendant had parked his vehicle, which he left running, across from the Pond Street house in such a manner as to allow for a speedy escape. Contrary to the state's contention, none of these facts, considered individually or together, supports a finding that the defendant committed assault in the first degree as an accessory predicated on Costa's shooting. On the contrary, there is no evidence from which the jury reasonably could have found that the defendant shot Costa, planned to have him shot or even knew that he would be shot, and there also is no evidence that the defendant participated in the shooting or otherwise aided the perpetrator who shot Costa.

The state's proof demonstrating that the defendant and the other perpetrators entered the Pond Street house to commit a robbery late at night, while its residents were inside, and did so with the intent to use force to overcome any resistance from the occupants does not support an inference that the defendant also had the intent to use the degree of force necessary to cause Costa, or anyone else in the house, serious physical injury, which, under our Penal Code, is defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious

loss or impairment of the function of any bodily organ." General Statutes § 53a-3 (4). In other words, evidence of the perpetrators' willingness to use force to overcome resistance from the occupants of the house does not constitute proof that the defendant formed the specific intent to cause Costa serious physical injury. Nor does the perpetrators' intention to overcome any such resistance constitute proof that the defendant participated in the shooting in any way or that he otherwise aided and abetted the perpetrator who shot Costa. Indeed, that general intention does not support an inference that the defendant was present in the common hallway when the shooting took place or that he knew about the shooting before it occurred.

Testimony placing the common hallway where Costa was shot near the first floor bedrooms does not support a reasonable inference that the perpetrators, including the defendant, witnessed the altercation between Costa and the perpetrator who shot him. Any such inference, however, would have scant bearing on the issue of the defendant's liability as an accessory to the shooting. Even if the defendant was aware of the altercation that culminated in the shooting, that fact alone does not sufficiently connect the defendant to the shooting to give rise to criminal liability. Indeed, even if the defendant had known in advance that the shooting would take place, that knowledge by itself would have been insufficient to establish the defendant's shared culpability for the assault without proof that the defendant actively aided, encouraged or assisted the principal offender; see, e.g., *State* v. *Bennett*, 307 Conn. 758, 771–72, 59 A.3d 221 (2013) (knowledge that crime will be committed, without more, is insufficient to prove accessorial liability); and there is no such proof in the present case.

Orr's possession of a handgun when he entered the Pond Street house does not reasonably support the inference that the defendant intended for Costa to suffer a serious physical injury and provides no indication of the defendant's state of mind with respect to Costa's

shooting. First, it is questionable whether the jury reasonably could have inferred that the defendant was aware that Orr was carrying a handgun merely because McNellis knew that Orr was armed. McNellis' brief testimony that Orr possessed a handgun consisted of only a few sentences and provided no context that shed any light on whether the defendant also knew that Orr was armed. Indeed, McNellis testified only that Orr was in possession of a black handgun and offered no explanation as to when she saw the weapon in Orr's possession, where he was carrying it, whether it was visible to the defendant when she observed it, or anything else to support an inference that the defendant, like McNellis, knew that Orr possessed a gun.[12] Given the paucity of McNellis' testimony about Orr's possession of the handgun, there was little basis for the jury to conclude the defendant knew that Orr was armed when the men entered the Pond Street house. See, e.g., *State* v. *Bemer*, 340 Conn. 804, 812, 266 A.3d 116 (2021) (inference cannot be based on mere possibilities or surmise).

Even if the jury reasonably could have inferred that the defendant knew that Orr was carrying a handgun, any such knowledge would be insufficient to support an inference either that the defendant intended to cause Costa serious physical injury or that he aided and abetted the perpetrator who inflicted that injury. At most, the defendant's knowledge that Orr was armed gave rise to an inference that *Orr* might use the handgun during the commission of the robbery. As we discuss at greater length hereinafter, however, the mere foreseeability

---

[12] The state asserts that, in light of McNellis' testimony that she was in the defendant's vehicle with both the defendant and Orr on the evening of the robbery, and because McNellis "did not testify at any point she saw Orr without the defendant . . . it was entirely reasonable for the jury to infer that when McNellis saw Orr wielding the firearm . . . the defendant was present and thus [also saw] the weapon." Although it is true that McNellis never testified that she saw Orr outside the defendant's presence, she also never testified that she, Orr and the defendant remained together at all times or that, when they were all together, they were situated in such a manner that it was likely the defendant also saw Orr in possession of the handgun.

that a weapon may be used during the commission of a crime does not equate to the purposeful intent necessary to establish accessorial liability. See *State* v. *Bennett*, supra, 307 Conn. 771 (foreseeability is not commensurate with conscious objective to cause result or engage in conduct required for accessorial liability). Moreover, there is no evidence that Orr, as distinguished from any one of the other perpetrators, shot Costa, nor is there any evidence that the defendant was present in the common hallway when Costa was shot or that he knew Costa would be shot. In fact, because there is so little evidence as to how or why the shooting occurred, it is by no means certain that the shooting was intentional rather than accidental. Even if we assume, however, that Orr intentionally shot Costa, and the defendant, with knowledge that Orr possessed a handgun, was present when the shooting took place, those facts are insufficient to support a finding of accessorial liability without proof that the defendant shared the specific intent to cause Costa serious physical injury and assisted the perpetrator in causing that injury. See, e.*g.*, id., 768–73 (evidence that defendant knew that perpetrator who shot victim possessed handgun and defendant was present when shooting occurred was insufficient to establish defendant's liability as accessory in absence of evidence that defendant had specific intent to kill victim and aided and abetted perpetrator in connection with victim's shooting). As previously discussed, the state adduced no such evidence.

The fact that the defendant did not seek aid for Costa after Costa was shot provides little support for the state's contention that the evidence was sufficient to establish that the defendant intended to seriously injure Costa. In *State* v. *Bennett*, supra, 307 Conn. 758, our Supreme Court addressed and rejected a similar claim under facts analogous to those of the present case. In *Bennett*, the defendant, Calvin Bennett, was convicted of murder as an accessory for the fatal shooting of the victim, James Caffrey, by Bennett's codefendant, Tamarius Maner. Id., 760–61. The shooting occurred during the commission of a robbery by Bennett and Maner at Caffrey's

apartment, after which both men fled without stopping to render aid to Caffrey. Id., 761–62. In concluding that Bennett's failure to assist Caffrey did not support an inference that Bennett had the intent to kill Caffrey, our Supreme Court first acknowledged the general principle that "[a] jury reasonably can infer an intent to kill from [a] defendant's failure to attempt to aid [the victim] or to show concern for [his] welfare following the shooting."[13] (Internal quotation marks omitted.) Id., 770. Our Supreme Court further explained, however, that "[w]e have stated this principle . . . in the context of cases in which the defendant inflicted the fatal injury but claimed no intent to kill . . . or in cases in which such evidence was used to impeach a defendant's claim that he did not share the principal's intent because of a good relationship with the victim. . . . We are unaware of any case, in this or other jurisdictions, however, in which intent to kill has been inferred solely or even principally from the defendant's failure to render aid to the victim." (Citations omitted.) Id., 770–71. As in *Bennett*, there is no proof that the defendant in the present case inflicted the injury on Costa or claimed that he had a good relationship with Costa, and the record otherwise lacks any indication that the defendant intended to cause Costa serious physical injury.

Moreover, in concluding that the evidence was insufficient to sustain Bennett's conviction of murder as an accessory, our Supreme Court explained, with respect to Bennett's failure to come to Caffrey's aid, that "[t]he sum of [Bennett's] conduct after Maner shot . . . Caffrey—both acts and omissions—did not provide a sufficient evidentiary basis to infer his intent to kill. Rather, the fact that the killing did not deter or delay [Bennett] from carrying on with the planned burglary leads to the reasonable inferences that [Bennett] was indifferent

---

[13] Although *State* v. *Bennett*, supra, 307 Conn. 758, involved a shooting that resulted in Caffrey's death and, therefore, Bennett was charged with murder as an accessory, this general principle is no less applicable when, as in the present case, the shooting results in serious physical injury, rather than death, to the victim.

to Caffrey's death or even that Caffrey's death was a foreseeable consequence of the [robbery]. Indifference, however, is not intent." Id., 771. The reasoning in *Bennett* is equally applicable here: there is nothing of consequence to be gleaned from the defendant's apparent indifference concerning the injuries Costa sustained because of the shooting. Furthermore, in the present case, the defendant knew that the other residents of the Pond Street house, as well as the police—who were already at the scene when the perpetrators fled—would come to Costa's aid, thereby obviating any concern that Costa would not receive immediate attention unless the defendant himself provided such aid.

Finally, the state's reliance on the fact that the defendant parked his car to enable a quick getaway is misplaced. Although that fact is probative of the defendant's plan to commit a robbery from which his prompt escape was required, it sheds no light on the defendant's state of mind and conduct, if any, with respect to Costa.

It is apparent, therefore, that the evidence, when considered in its totality and in the light most favorable to sustaining the verdict, falls short of the proof necessary for a finding that the defendant committed the offense of assault in the first degree as an accessory. Our Supreme Court reached the same decision in *State* v. *Bennett*, supra, 307 Conn. 758, the reasoning and holding of which are highly pertinent in the present case.

In *Bennett*, Maner and Bennett together walked up to the door of a Waterbury apartment to steal money and drugs and knocked on the door. Id., 761. Bennett was armed with a loaded handgun, as was Maner, who, in Bennett's presence, immediately shot and killed Caffrey when Caffrey opened the door. Id. Maner and Bennett entered the apartment and walked past Caffrey's body into the bedroom, where Bennett held his gun to the head of Caffrey's girlfriend, Samantha Bright, and demanded money and drugs. Id., 762. The two men then entered the kitchen, where they encountered Caffrey's mother. Id. With Bennett present, Maner fired a shot at Caffrey's

mother but missed, and both Bennett and Maner ran out of the apartment, pushing Caffrey's mother to the floor as they fled. Id. Following his arrest and trial, Bennett was convicted of, inter alia, murder as an accessory in connection with Maner's fatal shooting of Caffrey. Id., 760. As noted previously, however, on appeal, our Supreme Court reversed Bennett's conviction of murder as an accessory, concluding that the evidence was insufficient to support his conviction of that offense.[14] Id., 761, 774.

Despite the reversal of Bennett's conviction of murder as an accessory on grounds of evidentiary insufficiency, the facts in *Bennett* presented a considerably stronger case for accessorial liability than the evidence in the present case. In contrast to *Bennett*, there is no evidence in the present case that the defendant was armed; there is no evidence as to which perpetrator shot Costa; there is no evidence that the defendant was present when Costa was shot or that he participated in the shooting in any way; there is no evidence concerning the nature and circumstances of the confrontation between Costa and the perpetrator who shot Costa; and there is no evidence that the defendant took any violent or threatening action against Costa or anyone else.

The present case does bear marked similarities to *Bennett*, however, and, as in *Bennett*, such similarities all lead to the conclusion that the evidence was insufficient to support the defendant's conviction as an accessory to Costa's shooting. In particular, there is no evidence that the defendant shot Costa; there is no evidence that the defendant formed the intent to shoot Costa or planned to have Costa shot, either before or after entering the Pond Street house; there is no evidence that the defendant knew that Costa would be shot; there is no evidence that the defendant aided or assisted the perpetrator who shot Costa; there is no evidence that the defendant or any of the other perpetrators had any animus toward Costa or

[14] Bennett also was convicted of felony murder, home invasion and burglary in the first degree, but he did not appeal from those convictions. *State* v. *Bennett*, supra, 307 Conn. 760–61.

any other reason independent of the robbery to harm Costa or any other resident of the house; and there is no evidence that the defendant otherwise "solicit[ed], request[ed], command[ed], importun[ed] or intentionally aid[ed]" any one or more of the other perpetrators in the assault against Costa as required under § 53a-8.

Clearly, if, as our Supreme Court held in *Bennett*, there was insufficient evidence to establish Bennett's liability as an accessory for the shooting in that case, there can be no such liability for the shooting in the present case. The sparse evidence of the defendant's conduct establishes only that he entered the Pond Street house with the intent to commit an armed robbery. Nothing more is known about his role or involvement in the robbery, let alone about his role or involvement in Costa's shooting. By contrast, in *Bennett*, the jury had a clear and complete picture of the nature and extent of Bennett's violent and threatening conduct—including the fact that he was with Maner at the front door of the apartment, armed with a loaded handgun himself, when Maner shot and killed Caffrey—from the moment that he and Maner approached the apartment until they fled. *State* v. *Bennett*, supra, 307 Conn. 761–62. Given the absence of any evidence as to what, if anything, the defendant in the present case knew about Costa's shooting or what, if anything, the defendant did to aid or facilitate the shooting, it is apparent that the evidence of Bennett's involvement in and potential culpability for the shooting in that case was appreciably greater than that of the defendant in the present case. Consequently, *Bennett* forecloses the state's claim that the proof in this case supported a finding that the defendant committed the offense of assault in the first degree as an accessory.

Finally, *Bennett* is relevant to the present case for yet another reason, namely, in that case, our Supreme Court discussed the difference between accessorial liability under § 53a-8, which was charged in both *Bennett* and the present case, and vicarious liability under *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180,

90 L. Ed. 1489 (1946), a theory of liability that the state did not pursue either in *Bennett* or in this case,[15] and explained why the evidence against Bennett, though insufficient to support his conviction of murder as an accessory, likely would have resulted in his conviction of murder under *Pinkerton*. *State* v. *Bennett*, supra, 307 Conn. 774. That analysis in *Bennett* is equally germane to the present case and, therefore, bears repeating here, as follows.[16]

"Because [Bennett's claim] involves [the] sufficiency of proof to assign criminal responsibility to [him] for a fatal injury inflicted by another, it is useful to be mindful of the substantive differences between [accessorial liability and another theory] under which such vicarious liability may arise [namely] *Pinkerton* liability[17] . . . . [U]nder the *Pinkerton* doctrine . . . a defendant may not be convicted of murder unless one of his criminal associates, acting foreseeably and in furtherance of the conspiracy, caused the victim's death with the intent to do so. Thus . . . under *Pinkerton*, *a coconspirator's intent to kill may be imputed to a defendant who does not share that intent* . . . . The rationale for liability under this theory is that [w]hen the defendant has played a necessary part in setting in motion a discrete course of criminal conduct . . . he cannot reasonably complain that it is unfair to hold him vicariously liable . . . for the natural and probable results of that conduct that, *although he did not intend, he should have foreseen. . . .* [U]nlike coconspirator liability under *Pinkerton* . . .

[15] The prosecutor expressly informed the trial court in the present case that the state was not seeking to prove its case against the defendant on the basis of a *Pinkerton* theory of liability. The record does not disclose why the state declined to rely on *Pinkerton*.

[16] Although the defendant in *Bennett* was convicted of murder as an accessory and the defendant in the present case was convicted of assault in the first degree as an accessory, that difference is immaterial for purposes of the following discussion, which is equally applicable to both offenses.

[17] Our Supreme Court in *Bennett* also discussed felony murder, a third theory of vicarious liability. See *State* v. *Bennett*, supra, 307 Conn. 764. Because felony murder has no applicability to the present case, however, we have not included that portion of the analysis in *Bennett*.

. accessorial liability pursuant to § 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime . . . [and] the state must prove that the accessory, like the principal, had committed each and every element of the offense." (Citations omitted; emphasis in original; footnote added; footnotes omitted; internal quotation marks omitted.) *State* v. *Bennett*, supra, 307 Conn. 764–65.

After explaining the facts of the case as set forth previously herein, our Supreme Court in *Bennett* continued: "Our review of Connecticut appellate cases in which accessorial liability for murder properly was found underscores the deficiency of the proof in the present case. In every other accessorial liability case, the defendant had engaged in some act to prepare for, aid, encourage, facilitate or consummate the murder; it was from such acts that intent reasonably was inferred. In some cases, the defendant participated in the killing by inflicting, or attempting to inflict, harm on the victim while the principal inflicted the fatal injury, or the evidence was unclear as to whether the defendant actually inflicted the fatal injury. . . . In cases lacking such proof, the defendant otherwise actively participated in the murder through acts beneficial to the principal such as identifying the victim, taking the principal to the victim, distracting the victim, acting as a lookout to prevent interruption [of] the murder or facilitating the principal's escape. . . . Oftentimes, evidence of a motive to kill had been established. . . .

"No such evidence was proffered [against Bennett] in the present case. Although it is reasonable to infer from [Bennett's] entry into Bright's bedroom with a loaded gun immediately following [Caffrey's] shooting, simultaneously with Maner, that [Bennett] was in close proximity when Maner shot Caffrey and that [Bennett] was in possession of a loaded gun at the time, it would be sheer speculation to conclude that [Bennett] threatened Caffrey with the gun or engaged in *any* act preceding the shooting that aided, encouraged or facilitated the

shooting. One who is present when a crime is committed but neither assists in its commission nor shares in the criminal intent of its perpetrator cannot be convicted as an accessory. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it. . . .

"Moreover, as we previously have explained, although a foreseeable risk of death to a victim in the course of a crime is a basis on which . . . *Pinkerton* liability may be established, foreseeability is not commensurate with the conscious objective to cause death required for accessorial liability. . . . To find intent to kill under the present circumstances would obliterate a critical distinction between [the *Pinkerton* theory] of vicarious liability and accessorial liability. . . . Moreover, even if we can infer from [Bennett's] reaction that he was not surprised by Maner's conduct, [m]ere knowledge that a crime is going to be committed is not sufficient to establish liability as an accessory if the defendant does not encourage or intentionally aid in the commission of the crime. . . . Silent acquiescence [by a defendant, even] when [he] knew the plan [to kill the victim], [is] not enough to make [him] guilty of [murder as an accessory]. . . . The [s]tate [is] bound to prove more than that, and show that [he] knowingly abetted, counseled or encouraged [the principal] in his guilty purpose. . . .

"[In addition], there was no motive to kill independent of the burglary . . . . There also is no evidence to support an inference that [Bennett] aided or encouraged Maner with respect to the fatal act or that [Bennett] threatened Caffrey directly in any manner. . . . In our view, the evidence [against Bennett] would have made a strong case for murder under a theory of *Pinkerton* liability, but falls short of the requisite proof for accessorial liability. Therefore, because the state did not advance a theory

of liability under the *Pinkerton* doctrine, and the state did not prove beyond a reasonable doubt that [Bennett] intended to cause [Caffrey's] death, [Bennett's] conviction for murder as an accessory cannot stand." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) Id., 768–74.

Precisely the same may be said here. Although the state's proof in the present case did not establish the defendant's liability as an accessory to assault in the first degree, the evidence was more than sufficient to support a conviction under a *Pinkerton* theory of liability. Specifically, a jury reasonably could have found, in accordance with the requirements of *Pinkerton*, that the perpetrator who shot Costa did so foreseeably and in furtherance of the plan to steal money from the residents at the Pond Street house. In such circumstances, under *Pinkerton*, the conduct and intent of the perpetrator who shot Costa properly may be imputed to the defendant even though there is no evidence either that the defendant was involved in the shooting or that he knew it was going to happen. Instead of proceeding under a *Pinkerton* theory of vicarious liability, however, the state prosecuted the defendant for the assault under a theory of accessorial liability. Consequently, the foreseeability that Costa would be shot and seriously injured was insufficient to establish that the defendant had the intent to cause Costa serious physical injury.

The state assumed the burden of establishing beyond a reasonable doubt that the defendant, no different than the principal, had the conscious objective of causing Costa serious physical injury, and that he aided and abetted the perpetrator in causing that injury. As previously explained, however, the evidence cannot bear the weight that the state places on it with respect to either of those two elements of the offense of assault in the first degree as an accessory because the inferences that the state would have us draw from that evidence are based on speculative possibilities, not reasonable probabilities. See, e.g., *State* v. *Bemer*, supra, 340 Conn. 812

("[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture" (internal quotation marks omitted)); *Vance* v. *New Haven*, 236 Conn. App. 724, 740, 349 A.3d 1116 (2025) ("[u]nder our law, inferences must be based on probabilities, not possibilities" (internal quotation marks omitted)). Consequently, as in *Bennett*—and for essentially the same reasons identified by our Supreme Court in *Bennett*—the state failed to meet its burden of proof in the present case with respect to the charge of assault in the first degree as an accessory.

## II

The defendant next contends that the evidence was insufficient to support both his conviction of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1) and his conviction of conspiracy to commit robbery in violation of §§ 53a-48 and 53a-134.[18] With respect to his conviction of conspiracy to commit assault in the first degree, the defendant maintains that the evidence was insufficient to establish, first, that he entered into an agreement, either before or during the robbery, to cause Costa serious physical injury, and second, that he had the specific intent that a deadly weapon would be used in furtherance of any such agreement to assault Costa. With respect to his conviction of conspiracy to commit robbery in the first degree, the defendant asserts that the evidence was insufficient to prove that he had the specific intent that Costa would

[18] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

suffer a serious physical injury in furtherance of the agreement to commit the robbery. We agree with the defendant's claims.

Pursuant to § 53a-48 (a), "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." "Conspiracy . . . is a specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy." (Internal quotation marks omitted.) *State* v. *Pond*, 315 Conn. 451, 467, 108 A.3d 1083 (2015). Furthermore, in contrast to the offense of assault in the first degree as an accessory, for purposes of the charge of conspiracy to commit assault in the first degree, the state was required to prove both that the defendant entered into an agreement to cause Costa serious physical injury and that a deadly weapon would be used in furtherance of the commission of the offense. See id., 453 ("to be convicted of conspiracy, a defendant must specifically intend that every element of the planned offense be accomplished, even an element that itself carries no specific intent requirement"). Similarly, with respect to the charge of conspiracy to commit robbery in the first degree, the state was required to prove both that the defendant entered into an agreement to commit a robbery and that he intended that Costa would suffer a serious physical injury in furtherance of the commission of the offense. See id.

"[Although] the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances

surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Internal quotation marks omitted.) *State* v. *VanDeusen*, 160 Conn. App. 815, 824, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015).

To support the defendant's conviction of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a)(1), the state was required to prove that, at some time prior to Costa's shooting, either before or after the defendant entered the Pond Street house, the defendant agreed with one or more of the other perpetrators to cause Costa serious physical injury and, in addition, that the defendant had the specific intent that a deadly weapon would be used in connection with the offense. As explained in part I of this opinion, there is no evidence that the defendant had the intent to cause Costa serious physical injury, and, in the absence of such proof, there also is no evidence that he intended for a deadly weapon to be used to injure Costa. Having proved no such intent, the state necessarily also failed to prove that the defendant planned or conspired to cause Costa serious physical injury with a deadly weapon. That failure of proof entitles the defendant to the reversal of his conviction of the offense of conspiracy to commit assault in the first degree.

With respect to the charge of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (1), the state bore the burden of proving that the defendant agreed with one or more of the other perpetrators to commit a robbery at the Pond Street house, and that, in furtherance of the commission of the robbery, one or more of the perpetrators of the robbery would cause serious physical injury to Costa by use of a deadly weapon. As discussed in part I of this opinion, although the defendant does not dispute that the evidence was sufficient to establish that he committed a

robbery and that Costa suffered a serious physical injury during its commission, there was no evidence that the defendant ever formed the intent for Costa or anyone else to suffer a serious physical injury during the commission of the robbery. Consequently, there also is no evidence that the defendant agreed with any other perpetrator of the robbery to cause serious physical injury to any nonparticipant in that offense, including Costa. Because there was no such evidence, the state failed to prove that the defendant conspired to commit robbery in the first degree.

The state, however, raises an alternative argument in support of its claim that the defendant's conviction of conspiracy to commit robbery in the first degree was supported by sufficient evidence. This claim is predicated on the fact that, in contrast to the count of the information charging the defendant with robbery in the first degree in violation of § 53a-134 *(a) (1)*, the count charging the defendant with *conspiracy* to commit robbery in the first degree alleged that the defendant conspired to violate § 53a-134, without reference to subsection (a) (1) or any of the other three subsections of § 53a-134. See footnote 18 of this opinion. Relying on the fact that the information broadly charges the defendant under § 53a-134, without limitation to any specific statutory subsection, the state asserts that the defendant's claim of evidentiary insufficiency must fail with respect to his conviction of conspiracy to commit robbery in the first degree so long as the evidence was sufficient to prove the defendant's guilt under *any one* of the subsections of § 53a-134. The state further maintains that, because the evidence was sufficient to prove a violation of subsection (a) (2) of § 53a-134, which provides that a person is guilty of robbery in the first degree when "he or another participant" in the robbery "is armed with a deadly weapon," and the testimony established that at least one of the perpetrators, Orr, possessed such a weapon during the commission of the robbery, the defendant cannot prevail on his claim of evidentiary sufficiency.

As the defendant points out, however, the trial court instructed the jury under § 53a-134 (a) (1) *only*, making

no mention of any of the other subsections of § 53a-134. According to the defendant, the court's instruction "effectively limited the conspiracy charge to conspiracy to commit robbery in the first degree under [subsection] (a) (1) of § 53a-134." The state disagrees, explaining that, under long-standing precedent from both our Supreme Court and this court, the determination of the legal sufficiency of the evidence presented at trial must be based solely on the evidence presented and the elements of the crime charged in the information, and not on the court's jury instructions. See, e.g., *State* v. *Gradzik*, 193 Conn. 35, 38–39, 475 A.2d 269 (1984) ("The trial court cannot by its instruction change the nature of the crime charged in the information. . . . Though the [court's] instruction incorrectly limited the proof necessary for a conviction, on review of a sufficiency of the evidence claim this court looks to see if the evidence supports the verdict on the crime charged." (Citation omitted.)); *State* v. *Russell*, 101 Conn. App. 298, 327 n.30, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007) (explaining that there is "[no] authority for the proposition that a reviewing court, when determining whether sufficient evidence exists to sustain a conviction, must do so with reference to the jury charge rather than to the elements of the crime as statutorily defined and as set out in the information").

The state is correct that, on appellate review, resolution of a claim of evidentiary insufficiency must be based on a determination of whether the evidence was sufficient to establish each of the elements of the offense charged in the information, and not on whether the evidence was sufficient under the erroneous jury instruction. In the present case, however, the court instructed the jury that, to find the defendant guilty of robbery in the first degree, the state must establish that the defendant conspired to commit robbery in the first degree *in violation of § 53a-134 (a) (1)*, and did not instruct the jury on any of the other three subsections of § 53a-134 (a). Moreover, the state never sought an instruction that included those other statutory subsections, nor did the

state inform the court, after the jury instructions were given, that its instruction on conspiracy to commit robbery in the first degree was incomplete or inadequate. It is highly implausible that the state intended to prosecute the defendant for conspiracy to commit robbery in the first degree under any or all of the four subsections of § 53a-134 and yet took no corrective action when the court failed altogether to instruct the jury under subsections (a) (2), (a) (3) and (a) (4) of § 53a-134.

In such circumstances, it is apparent that the state, the defendant and the court understood that, although the information charging conspiracy to commit robbery in the first degree referred to § 53a-134, the state was proceeding against the defendant under § 53a-134 (a) (1), *just as it had charged the defendant under § 53a-134 (a) (1) for purposes of the offense of robbery in the first degree*. Indeed, the understanding of the parties and the court in this regard is further reflected by the fact that the court, without objection, instructed the jury on the offense of conspiracy to commit robbery in the first degree by *express reference* to the court's earlier instruction on the count of the information charging the defendant with robbery in the first degree in violation of § 53a-134 *(a) (1)*.[19] Thus, in accordance with the

[19]The court instructed the jury in relevant part as follows: "The defendant is charged in count four with conspiracy to commit robbery in the first degree. You will recall that I previously charged you in relation to count two on the crime of conspiracy and all the elements relating thereto. I instruct you to apply that instruction to this count as well. *You will additionally recall that I have previously instructed you in relation to count three on the crime of robbery in the first degree and the elements relating thereto, and I instruct you that you shall apply that instruction to this count as well.*

"In summary, as to conspiracy, the state must prove beyond a reasonable doubt that the defendant had an agreement with one or more persons to commit robbery in the first degree, at least one of the coconspirators did an overt act in furtherance of the conspiracy, the defendant specifically intended to enter into the agreement and intended the conduct and had the specific intent that each independent element constituting the crime of robbery in the first degree.

"*As to the crime of robbery in the first degree, the state must prove beyond a reasonable doubt: 1) that the defendant was committing larceny; 2) that he used physical force or threatened the use of physical*

apparent intent of the parties, the state was required to prove that the defendant conspired to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 *(a) (1)*, and the court properly instructed the jury under those statutory provisions. Consequently, the state's claim that the defendant's conviction of conspiracy to commit robbery in the first degree should stand because the evidence was sufficient to establish a violation of §§ 53a-48 and 53a-134 *(a) (2)* is unavailing.

For the foregoing reasons, the evidence was insufficient to establish that the defendant committed the offenses of assault in the first degree as an accessory, conspiracy to commit assault in the first degree, and conspiracy to commit robbery in the first degree. Accordingly, the defendant is entitled to reversal of his convictions of those offenses and to a judgment of acquittal on each of the charges.

The judgment is reversed with respect to the defendant's convictions of assault in the first degree as an accessory, conspiracy to commit assault in the first degree, and conspiracy to commit robbery in the first degree, and the case is remanded with direction to render a judgment of acquittal on those charges and for resentencing; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

*force in preventing or overcoming resistance to the taking of property or compelling the owner of the property or another person to deliver up the property or to engage in other conduct that is in the commission of larceny and that in the course of the robbery the defendant or another participant in the robbery caused serious physical injury to another person, in this case, Geraldo Costa, who is not a participant in the crime.*

"*So, I'll refer you back to my instructions on both the conspiracy and the robbery in the first degree, counts two and three, and instruct you to apply it to this count as well.* Again, the state has the burden of proving each and every element beyond a reasonable doubt. If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of conspiracy to commit robbery in the first degree, then you shall find the defendant guilty.

"On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements you shall then find the defendant not guilty." **(Emphasis added.)**